IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |  |
|---|---|---|
| WELDON  H. ANGELOS, | : | Civil Case No. 2:07-CV-936-TC |
|  | : | Criminal Case No. 2:02-CR-708-PGC |
| Petitioner, | : |  |
|  | : | ORDER AND MEMORANDUM |
| vs. | : | DECISION |
|  | : |  |
| UNITED STATES OF AMERICA, | : | Judge Tena Campbell |
|  | : |  |
| Respondent. | : |  |

**Introduction**[1]

On December 3, 2007, Weldon Angelos filed a motion pursuant to 28 U.S.C. § 2255

alleging, among other things, that his attorney, Jerome Mooney, provided ineffective assistance

of counsel.  Mr. Angelos claimed that Mr. Mooney's failure to "effectively assess and advise him

about the plea and sentencing dynamics based on the original indictment amounted to

constitutionally deficient performance that significantly prejudiced Angelos."  (Mot. Vacate (Dkt.

No. 1) at 12.)  Mr. Angelos further asserted that Mr. Mooney "failed to negotiate competently

with prosecutors to reasonably limit Angelos's sentencing exposure were he to plead guilty

(which Angelos was again prepared to do)."  (Id.)  Mr. Angelos claimed that "[b]ut for counsel's

deficient performance, Angelos would likely have initially pleaded guilty following the original

---

[1]In a previous order, the court described much of the factual and procedural background
of this case.  (See Dec. 8, 2008 Mem. Dec. & Order (Dkt. No. 28) (unless otherwise noted, all
citations are to the civil case).)  Consequently, the court will not repeat these background facts
except where necessary to explain this order.

indictment and faced a sentence less than one-tenth of the sentence he eventually faced at trial."

(Id. at 13-14.)

The United States responded to Mr. Angelos's motion, and the court ordered an

evidentiary hearing on the limited issue of "[w]hether [Mooney] provided ineffective assistance

to Mr. Angelos in light of the United States' plea offer and its representation that it would seek a

superseding indictment if the offer were rejected[.]" (Dec. 8, 2008 Mem. Dec. & Order (Dkt.

No. 28) at 37.) Before the evidentiary hearing, Mr. Angelos and Mr. Mooney filed sworn,

written statements. (See Decl. of Jerome H. Mooney (Dkt. No. 30); Aff. of Weldon H. Angelos

(Dkt. No. 33).) The United States filed the declaration of Assistant United States Attorney

Robert A. Lund. (See Decl. of Robert A. Lund (Dkt. No. 41).) The hearing was held on March

6, 2009.

The court has carefully reviewed the declarations, the parties' memoranda, and the

transcript of the hearing. The court finds that Mr. Mooney's testimony was fully credible and

corroborated by other evidence in the record. The court also finds that although Mr. Angelos

recognized the possible consequences of refusing the government's offer and going to trial, he

voluntarily chose to reject the government's offer. Accordingly, the court concludes that Mr.

Angelos has failed to establish that he received ineffective assistance of counsel and so DENIES

Mr. Angelos's motion.

## Factual Findings

### November and December 2002

Mr. Mooney, an attorney with thirty-six years experience, testified that he was hired to

represent Mr. Angelos after Mr. Angelos's arrest in November 2002. He had previously

represented Mr. Angelos in matters related to the music business.

During their first meeting, he and Mr. Angelos discussed the initial charges, what had

happened, what Mr. Angelos had been involved in, his involvement with some of the people who

also were involved, and "what he had done with regards to being at and selling the marijuana on

the occasions." (Tr. of Mar. 6, 2009 Evidentiary Hr'g (Dkt. No. 52) (Tr.) at 63-64.)  This

information was important to Mr. Mooney because it helped him determine how to structure and

defend the case and to know what the relevant conduct under the federal sentencing guidelines

was likely to be.  As Mr. Mooney explained, "in a drug case, without knowing relevant conduct,

numbers are meaningless."  (Id. at 64.)

Mr. Mooney discussed the potential penalties with Mr. Angelos "fairly early."  He

testified that, "I know that I pointed out that the 924(c) was serious and carried a five year

mandatory minimum sentence."  (Tr. at 41, 72.)   Mr. Mooney told Mr. Angelos that the sentence

on the gun charge, a violation of 18 U.S.C. § 924(c), was going to be additional to anything for

the marijuana count "and so that it would really pump up the charges." (Id. at 72.)  Because the

mandatory sentencing guidelines were still in effect at that time, Mr. Mooney explained the

guidelines to Mr. Angelos, including the concept of acceptance of responsibility.

For the marijuana charges, Mr. Mooney calculated a sentence under the guidelines based

on what the government "said about the transactions" and what Mr. Angelos had told him.  (Tr.

at 70-72.)  He looked at the drug quantity tables in the guidelines to "try to get some sort of a

sense of where this was likely to fall with regard to the marijuana charges." (Id. at 71.) Although

Mr. Mooney did not have a firm recollection of what he told Mr. Angelos about the sentencing

guideline range early in the case, Mr. Mooney testified that he believed the range was seven to

eight years, which included five years for the 924(c) count and an additional two to four years for

the marijuana charges (depending on the quantity).  He told Mr. Angelos that the figure was the

probable estimate based on what they knew at that point, but that Mr. Angelos should not be

surprised to see the government "continuing to give us additional information and continuing to

try to do things to make it look worse."  (Id. at 75.)

According to Mr. Mooney, "[e]arly on [Mr. Angelos] knew that he was going to be

convicted on the marijuana charges.  There's no doubt about that."  (Tr. at 66.)  But Mr. Angelos

did dispute the gun charge.

On December 16, 2002, officers searched a house where Mr. Angelos's girlfriend was

living and found marijuana, cash and firearms.  Mr. Mooney testified that he and Mr. Angelos

"were communicating quite frequently about what was going on."  (Tr. at 95.)  They spoke about

the December search, and Mr. Mooney told Mr. Angelos "that this isn't a good thing, obviously,

and that this would probably lead to – potentially lead to additional charges, and we tried to

figure out what all we were facing."  (Id.)

Meeting with Law Enforcement

Mr. Mooney testified that the issue of cooperation came up very quickly "because in our

first conversation I know one of the things that [Mr. Angelos] said was, 'Well, what if I

cooperate?'" (Tr. at 42, 67.)  Mr. Mooney explained to Mr. Angelos that with a cooperation

agreement and a 5K1.1 motion under the sentencing guidelines, the judge would be authorized to

impose a sentence below the guidelines and that would make a lower sentence available.  Mr.

Mooney elaborated:

[T]he cooperation was something that Weldon said that he was interested in

doing.  And I told him that cooperation would have positive benefits if it was
something that he could do and that we should – and what I told him is if we're
going to meet with these people and talk about cooperation, we needed to do it in
good faith, and we had to make sure that this is what he wanted to do, and we
were ready to follow through and do it.

(Id. at 89.)

On December 17, 2002, Mr. Angelos and Mr. Mooney met with law enforcement to

discuss the possibility of Mr. Angelos's cooperation, but the meeting was not successful.  The

agents did not believe what Mr. Angelos told them.  In fact, Mr. Angelos admitted at the hearing

that he had not been totally honest at the meeting although, according to Mr. Angelos, he did not

"lie," he just "omitted things."  (Tr. at 8.)  Following the meeting, Mr. Mooney tried to make

Angelos "feel better about the fact that things had gone completely pear-shaped."  (Id. at 43.)  He

told Mr. Angelos that it was "not all that bad that you're not going to have [an] opportunity to

work with these guys.  There's a lot of problems when you end up having to work with them, and

there's a lot of things they would have wanted you to do . . . ."  (Id.)[2]

Mr. Mooney did not discuss cooperation with Mr. Angelos again because, according to

him, it was no longer an option.  (Tr. at 91-93.)  Robert Lund, who was the Assistant United

States Attorney in charge of the case, confirmed that Mr. Angelos no longer had that option:

"My position at that point [after the meeting] was cooperation was not a possibility because we

had Mr. Angelos lying initially to the agents." (Id. at 133.)

---

[2]After that meeting, the issue of cooperation did not come up again until after Mr.
Angelos was convicted at trial, when, at the trial judge's insistence, agents again met with Mr.
Angelos.  This meeting was not successful primarily because the agents believed that Mr.
Angelos did not have any useful information.

Plea Negotiations

Mr. Mooney had estimated that under the sentencing guidelines Mr. Angelos faced a

sentence on the marijuana charges of approximately twenty-four to twenty-seven months.  In late

November or early December 2002, Mr. Mooney suggested to Mr. Lund that Mr. Angelos would

be willing to plead guilty to the marijuana charges in exchange for the government dropping the

§ 924 charge.  Mr. Lund told Mr. Mooney that the government required a plea to the most readily

provable serious offense, which was, in Mr. Angelos's case, the § 924(c) charge.  Mr. Mooney

told Mr. Angelos that the government was taking the position that a plea to the gun charge was

necessary.  According to Mr. Mooney, he told Mr. Angelos that he "was still hopeful that we

might be able to do something, and certainly cooperation might be something that would help."

(Tr. at 87.) (This conversation occurred before the unsuccessful meeting with law enforcement.)

On January 20, 2003, Mr. Lund gave Mr. Mooney a written plea offer.  (Jan. 20, 2003

Letter, Hr'g Ex. C.)  In the letter, the government proposed that Mr. Angelos plead guilty to the

first two counts of the indictment (that is, the May 21, 2002 distribution of marijuana charge and

the § 924(c) count of possession of a firearm in furtherance of the May 21 drug transaction) and

stipulate to a sixteen-year sentence.  In exchange, the government would not seek a superseding

indictment.  But if Mr. Angelos rejected the plea offer, the government would seek a superseding

indictment which would include five § 924(c) charges.  In the letter, Mr. Lund described the

penalties Mr. Angelos would then face:

> As previously mentioned, the first conviction for a 924(c) violation
> carries a mandatory minimum sentence of five (5) years.  Subsequent convictions
> for that offense, even if from the same indictment, carry a mandatory minimum
> sentence of twenty-five (25) years each.  The statute mandates that these sentences
> run consecutively to each other and to the underlying drug trafficking crimes.  Given

those facts, the exposure to your clients [sic] is in excess of one hundred and thirty (130) years.

(Id. at 2.)  Mr. Mooney requested additional time from the government to discuss the plea offer

with Mr. Angelos, and Mr. Lund agreed.

Mr. Mooney testified that he showed a copy of the plea offer letter to Mr. Angelos, asked

him to read the letter, and went over each point in the letter with Mr. Angelos.  Mr. Mooney

testified that he "went through and discussed with [Angelos] each of the ten charges" that were in

the letter.  (Tr. at 102.)  Mr. Mooney further testified that he believed Mr. Angelos understood

what Mooney was telling him.  On the stand, he explained:

> It's complex, and there's an awful lot of additional material that's in here.  And
> the one thing that I remember is that he got very animated about some things that
> they were saying in here that he just kept saying those weren't true, and I thought
> he was fixating on some of those.  But, you know, we did talk about everything,
> but he was fixating on the things that were said in the letter that he just kept
> saying, "That's just not true.  That just didn't happen."

(Tr. at 46.)

> According to Mr. Mooney, Mr. Angelos was
>
> angry that he was being accused of having a firearm during those [Lazalde
> marijuana] sales.  And we spent an awful lot of time continuing to go back to
> those two events.  Throughout the whole course of working, those would keep
> rising up.  And every time we'd get to those, he would become very disturbed,
> very upset about the fact that he was being accused of that.

(Id. at 53.)  Mr. Mooney testified that Angelos told him that he did not have a firearm during the

May 21 drug transaction.  According to Mr.  Mooney, Mr. Angelos "was adamant and credible

that he did not have a firearm, and the nature of the relationship that we had, I believed him."

(Id. at 52.)

Mr. Mooney told Mr. Angelos it was Mr. Angelos's decision whether to take the offer or

not.  He told Mr. Angelos "that the risk was significant, and that if he was convicted of all of

these charges, that that was an awfully long period of time." (Tr. at 47.)  Although Mr. Mooney

told Mr. Angelos that he thought that a sixteen-year sentence was "completely unfair" and that he

didn't know how Mr. Lund arrived at that number, Mr. Mooney testified that he believed that

Mr. Angelos did not interpret that statement as a recommendation that he not plead guilty.  (Tr. at

103.)

Mr. Mooney told Mr. Angelos that a § 924(c) charge could be based on the guns found in

Mr. Angelos's apartment and that it was the most difficult of the 924(c) charges that the

government had presented because the guns were, in fact, found in his apartment.  Mr. Mooney

explained, "I know that when we discussed the 924(c) charges, the one I was always most

worried about was the guns in the house" and Mooney told Angelos that.  (Tr. at 48.)  Mr.

Mooney also explained to Mr. Angelos that having more than one 924(c) conviction increased

his sentencing exposure.  Mr. Mooney testified that "anytime we talked about the 924(c) counts I

would talk about five years and then the 25, 25, 25, the fact that it blew up and became much

more serious."  (Id. at 99.)

Mr. Mooney suggested that Mr. Angelos consider pleading to one § 924(c) count, but Mr.

Angelos refused. (Tr. at 105-07.)  Mr. Mooney explained to Mr. Angelos that pleading to one

§ 924(c) count would expose Mr. Angelos to a five-year mandatory sentence while even one

additional conviction was an additional 25 years.  (Id. at 107.)

At the hearing, Mr. Angelos admitted that Mr. Mooney had showed him the January 2003

plea letter to him and "explained it."  (Tr. at 14.)

Contrary to his statement in his affidavit, Mr. Angelos testified at the hearing that Mr.

Mooney told him there was a § 924(c) count based on the weapons that were found in Mr.

Angelos's apartment on November 15th.  Significantly, Mr. Angelos admitted that Mr. Mooney

explained "that additional 924(c) convictions carried stacking 25 year terms of imprisonment[.]"

(Tr. at 13.)  Mr. Angelos understood that "stacking" meant that additional § 924(c) convictions

carried consecutive 25-year terms of imprisonment.  (Id.)  Mr. Angelos testified that he was not

willing, in either 2002 or 2003, to plead guilty to a § 924(c) charge.  (Id. at 12.)

Mr. Mooney answered, in response to the court's question whether he advised Mr.

Angelos to take the 16-year sentence instead of facing a possible 105-year sentence:

> Yes and no.  Certainly talked about 16 years is a lot less than 105 years.  And one
> of the difficulties is it's always difficult to advise people to accept things which
> are more draconian than what they believe that they've done.
>
> . . . .
>
> Even at the 16 years it was greater than what the penalty should have been for
> what he did.  So it's always important in the relationship, and in my conversations
> with Mr. Angelos, we talked about what he did, and we talked about what was
> proper.  And I always told him that I thought that the 16 year offer was unfair, but
> I also told him that as unfair as it was and improper as it was, that he certainly –
> and he was the only one that could make the decision.  He was the only one.  And
> that he had to weigh that offer, which was unfair, against the risk, and that I would
> – and that I would support him in his decision, whichever way he decided to go.

(Tr. at 48-49.)

Mr. Mooney testified that after he had reviewed the letter with Mr. Angelos,

> [t]he only thing that I really remember about it is him saying that with the things
> that he was working on and the things that were starting to happen for him and
> what was going on in his life, that 16 years was just way too long.  And in 16
> years he would not be able to see his children grow up.  In 16 years he would have
> to abandon completely all of the economic things that he was working on and the
> successes that he was beginning to have in the record business.  In 16 years the
> relationships that he had with other people would be completely destroyed.  And
> the 16 years, even though it was a lot better that 105 years, the 16 years was much

9

too long.

(Id. at 49-50.)  Mr. Mooney testified that when Mr. Angelos told him that he would not accept

the 16-year offer, Mr. Mooney explained to Mr. Angelos that the alternative was going to trial

and facing the penalties.

Mr. Lund corroborated Mr. Mooney's testimony.  Mr. Lund recalled that Mr. Mooney

"advised me that he'd been in touch with Mr. Angelos, that they'd gone over the written offer,

and that Mr. Angelos essentially was rejecting the offer because he would not plead guilty to a

924(c) count." (Tr. at 140.)  Mr. Lund testified that Mr. Angelos's plea to a § 924(c) count was "a

prerequisite" to any plea agreement.  (Id.)  After Mr. Angelos rejected the offer, Mr. Mooney

began to prepare for trial.

November 2003

Mr. Mooney testified that, as trial approached, he told Mr. Angelos that "we should

consider [offering to plead guilty to] the one 924(c) count that we were in trouble on [i.e., the

charge based on the guns found in Mr. Angelos's apartment]."  (Tr. at 111.)  Mr. Mooney

explained that he thought it was in Mr. Angelos's best interest to enter into a plea prior to trial:

> [I]f we could have gotten a plea with a single 924(c), which I figured we'd lose,
> and the drug charges, which we had already agreed to concede – by the way, we
> agreed we were going to concede those to the jury so that we would have
> credibility.  If we could get something that involved those, and maybe even
> something with an ancillary charge in there, that it would be in his best interest to
> take that deal, because we were probably going to lose those four counts as a
> minimum.

(Id. at 112-113.)  Mr. Mooney testified that he tried to encourage Mr. Angelos to authorize him

to make that offer to the government.  (Id. at 113.)  Mr. Mooney explained that he attempted to

reopen negotiations at that time because:

> [w]e were on the verge of the plea negotiation deadline.  We were up against trial.
> Weldon was faced with the – you know, the – the reality of trial is right there.  It's
> right in front of us.  And, quite frankly, he – his attitude hadn't changed much, but
> it was – it was the last opportunity, and I just felt like I would be remiss if I didn't
> make a run at it.

(Id. at 122.)

Mr. Mooney filed a motion with the court to extend the plea deadline.  (Tr. at 58.)  He

wrote a letter to the government suggesting a plea to "the marijuana, the money laundering and

the [non-924(c)] gun charge."  (Tr. at 29-30, 56-57; Hr'g Ex. E.)  Mr. Lund testified that he

received the written counteroffer (Ex. E) on November 7, 2003, and that Mr. Mooney had been in

contact with him before the letter was sent.  But Mr. Lund told Mr. Mooney, "at that point in

time, that close to the trial, after the government had expended, you know, untold amount of

resources preparing for trial, litigating suppression hearings, doing all that, that it was too late in

my view to settle the case." (Tr. at 141.)  Mr. Lund told Mr. Mooney that if there was going to be

any settlement, Mr. Mooney would need to present the counteroffer to the United States

Attorney, Paul Warner.

On November 13, 2003, Mr. Lund sent Mr. Mooney a letter rejecting the defense

counteroffer.  (Nov. 13, 2003 Letter (Hr'g Ex. F).)  Mr. Lund testified that Mr. Warner rejected

the counteroffer because, "for one thing, the offer didn't contain an offer to plead guilty to a

924(c) count."  (Tr. at 142.)

Mr. Lund testified that the government would not have accepted a sixteen-year plea offer

from Mr. Angelos on the eve of trial: "On the eve of trial, no way." (Tr. at 148.)  Mr. Lund

explained that although the government would have accepted "the right plea agreement" at that

time, "it would have been terms that would have been less advantageous for Mr. Angelos.  We

wouldn't have given him a better offer." (Id.)  Mr. Lund reiterated that cooperation was no

longer an option for Mr. Angelos:

> The problem is Mr. Angelos expended his credibility.  I don't know how we were
> going to cooperate with him when we didn't believe him.  And part of that went to
> the statements that we believe were untruthful.  Part of it also went to his
> persistence in denying that he carried guns when he distributed drugs, when we
> believed that we had more than abundant admissible and not admissible evidence
> that proved that up.  So that in my mind seriously hampered his credibility.

(Id.)

## Analysis

To establish ineffective assistance of counsel, a defendant must show that his counsel's

performance was deficient and that his counsel's deficient performance prejudiced him.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  To prove that counsel's performance was

deficient, a defendant must show "that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.

Furthermore, the defendant must show that counsel's performance fell below an objective

standard of reasonableness.  Id. at 688.  "Judicial scrutiny of counsel's performance must be

highly deferential."  Id. at 689.  "[C]ounsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment."  Id. at 690.

To establish prejudice under Strickland, a defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.  Id. at 694.  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  Id.  In the context of a claim of ineffective assistance of counsel in

plea bargaining, for "the prejudice prong, there must be a reasonable probability that but for

incompetent counsel a defendant would have accepted the plea offer and pleaded guilty." United

States v. Carter, 130 F.3d 1432, 1442 (10th Cir. 1997).

"[A] court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground

of lack of sufficient prejudice, . . . that course should be followed." Id.

The court concludes that Mr. Mooney gave Mr. Angelos competent and thorough

representation. The record shows that Mr. Mooney explained to Mr. Angelos the nature of the

charges against him, the possible penalties (including the effect of the "stacking" of the § 924(c)

charges), and the consequences of rejecting the government's plea offer.[3] Although Mr. Mooney

told Mr. Angelos that the decision to accept the government's plea rested with Mr. Angelos, Mr.

Mooney made sure that Mr. Angelos understood the harsh penalty he faced if he refused the

offer. Mr. Angelos admitted that Mr. Mooney showed him the January 20, 2003 plea offer letter

from Mr. Lund. That letter left no doubt of the consequences of refusing the plea offer. Mr.

Mooney testified, and the court accepts that testimony, that he tried to persuade Mr. Angelos to

plead to a § 924(c) charge but Mr. Angelos refused.

As far as any prejudice to Mr. Angelos, it was clear that Mr. Angelos would not accept a

sixteen-year sentence and also would not accept an offer that required him to plead to a § 924(c)

---

[3]The court finds that the statements made by Mr. Angelos, particularly in his affidavit, that contradict the testimony and declarations of Mr. Mooney and Mr. Lund are not credible. Mr. Mooney's testimony was corroborated by that of Mr. Lund. Moreover, the exhibits received at the hearing further support Mr. Mooney's testimony.

charge.  Furthermore, as shown by the testimony of both Mr. Mooney and Mr. Lund, when Mr.

Angelos was not forthright with the government agents, he destroyed any chance of receiving a

lighter sentence by cooperating.  Moreover, Mr. Lund's testimony left no doubt that unless Mr.

Angelos agreed to plead to a § 924(c) charge, the government would not enter into any kind of

plea agreement with Mr. Angelos.

 For all of the reasons set forth above, the court DENIES the remainder of Mr. Angelos's

Motion to Vacate (Dkt. No. 1).

 DATED this 28th day of April, 2009.

<div style="margin-left:40%">

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

</div>